HEMENWAY, Inc., v. WILLIAMSON.

No. 5423.

Court of Appeal of Louisiana. Second Circuit.

April 1, 1937.

Foster, Hall, Barret & Smith, of Shreveport, for appellant.

Craig, Bolin, Magee & Baucum, of Shreveport, for appellee.

DREW, Judge.

Plaintiff instituted this suit for the amount of $785.88, being the alleged balance due on a chattel mortgage note representing the unpaid purchase price of a milk-cooling unit which was sold to defendant on April 10, 1936. The note and chattel mortgage are dated April 29, 1936.

The milk-cooling system is alleged to have been installed on May 3, 1936, and the monthly installments, according to the tenor of the note, in the sum of $21.83, became due on the 20th of each month thereafter. At the time this suit was filed, September 9, 1936, the installments due for May, June, July, and August had not been paid. Plaintiff alleged that all installments had become due and payable on account of the accelerating clause in the note and mortgage.

Defendant in answer admitted the execution of the note and chattel mortgage, but denied owing plaintiff any amount for the alleged reason it had breached its warranty of the thing sold; that the system would not cool the milk as it was guaranteed to do; that the cost of operating it was greatly in excess of the amount warranted by plaintiff; that it was improperly installed and would not and did not run as it was represented; and, in general, was unfit for the purpose for which it had been sold.

The defense is set out in the following language:

"3. Further answering, defendant alleges that he is a farmer and dairyman located near Stonewall, DeSoto parish, Louisiana, where he has been, more or less, extensively engaged in the dairy business for the past 20 years or more; that the greater portion of his income during this period has been derived from the sale of milk to the public, and especially, by wholesale, to the Creamery Companies in the city of Shreveport, Caddo parish, Louisiana.

"4. Defendant further shows that, in order to meet the demands of the public and the sanitary requirements by the purchasers and health authorities of the city of Shreveport, Louisiana, and of the state of Louisiana, he is and has been required to properly cool and preserve his supply of milk so as to deliver the same to the purchasers in the city of Shreveport, Louisiana, and elsewhere, at a temperature of not higher than 50 degrees Fahrenheit, and that this cooling process has been accomplished for the past 20 years or more by the use of ice twice daily immediately after his dairy herd has been milked in the morning and in the afternoon.

"5. Defendant further shows that by the use of ice, as aforesaid, he has been able to properly cool and preserve his supply of milk to the right temperature and meet all sanitary regulations and made said milk more wholesome for public consumption, but at considerable expense to your defendant.

"6. Defendant further shows that a short time prior to April 29, 1936, a representative of the plaintiff company called on the defendant at his home at Stonewall, Louisiana, inspected defendant's dairy and his method of cooling his supply of milk and thereon agreed to sell and install certain cooling equipment for defendant in his dairy, which equipment the said representative guaranteed would reduce by one-half defendant's expense in properly cooling and preserving said milk and that said equipment, when installed, would also amply cool and preserve all of defendant's supply of milk to meet all sanitary conditions and requirements and at less expense, as aforesaid, and with considerable less time and trouble to defendant.

"7. Defendant further shows and alleges that he is and was ignorant of the mechanics of the cooling system which plaintiff's representative proposed to sell and install for said defendant, and your defendant accepted as true the statements and warranties made and agreed upon by plaintiff's representative; that after plaintiff's representative personally inspected, as aforesaid, defendant's dairy and all his equipment, defendant agreed to purchase the articles properly installed, described in paragraph 2 of plaintiff's petition, which equipment said representative guaranteed would give perfect satisfaction, properly cool and preserve defendant's supply of milk, reduce defendant's expense by one-half and, in substance, that said equipment would serve defendant's purpose for which he had purchased same.

"8. Your defendant further shows and alleges that he executed said note and chattel mortgage, which are dated April 29, 1936, and at the time said chattel mortgage and note were executed by defendant, the representative of plaintiff company agreed that said cooling equipment would be installed immediately, and, as a matter of fact, said equipment was not installed for a period of approximately four weeks; that said delay was inexcusable and unreasonable, and that during said period several persons or mechanics of the plaintiff company visited defendant's dairy appearing to do some small job in connection with the installation, but none of them seemed to know just what they were to do.

"9. Your defendant now alleges that said equipment is inadequate, defective and was not properly installed to serve the purpose for which it was sold to defendant; that the defectiveness and inadequacy of said equipment is more peculiarly within the knowledge of plaintiff company.

"10. Your defendant further shows that immediately after said equipment was finally installed (so-called), defendant began to have trouble with said equipment in that it would not continuously run and that when it did run, said equipment would not properly cool and preserve his supply of milk, as aforesaid; that defendant immediately notified plaintiff company to rectify the trouble, but that defendant continuously from the time said equipment was installed up to and around July 20, 1936, was making demands on the plaintiff company to adjust the defects in said equipment, but that plaintiff company made no effort to, refused and failed to adjust said equipment so as to properly and efficiently cool and preserve defendant's supply of milk for which said equipment was sold.

"11. Your defendant further shows that he gave plaintiff's equipment, as aforesaid, approximately three months' trial and all during this time he was continuously having to buy ice and having trouble with the equipment which plaintiff installed.

"12. Your defendant, therefore, for the reasons set out above, shows and alleges that the consideration for said note and chattel mortgage has failed and, for the reasons hereinabove set out, the warranties made out by plaintiff, express and implied, as aforesaid, have been breached and that, for said reasons, defendant owes plaintiff nothing, and which defenses are hereby specially pleaded against plaintiff's claim in this suit.

"And, now, assuming the position of plaintiff in reconvention, defendant avers:

"13. Defendant reaffirms all the allegations in the above and foregoing answer, and further alleges that defendant at the time the said note and chattel mortgage were signed, he paid the plaintiff company the sum of $74.00 as part of the purchase price of said equipment and for which said amount defendant alleges that plaintiff is indebted unto him, with interest at the rate of 5% per annum from judicial demand until paid.

"14. Your defendant further shows that, for the reason alleged in the above

and foregoing answer, the consideration for said note and chattel mortgage has failed and plaintiff has breached the warranties, express and implied, which failure, consideration and breach of warranties, as above alleged, are herein specially pleaded and your defendant is entitled to have said sale rescinded.

"15. Your defendant further shows that on or about July 20, 1936, he notified plaintiff he would make no further payments on the purchase price of said equipment, and requested said plaintiff to take up said equipment, return the note described in plaintiff's petition and cancel the chattel mortgage, which request was refused by plaintiff.

"Wherefore, your defendant prays that plaintiff's suit be dismissed at its cost and, in reconvention, your defendant prays that he have judgment against the said plaintiff in the sum of $74.00, with 5% interest thereon from judicial demand until paid, and for further judgment rescinding and setting aside the sale of said equipment and ordering the said plaintiff to return to the defendant the note or notes sued on or described in plaintiff's petition."

The lower court rejected the demands of plaintiff and granted judgment for defendant in reconvention for the amount prayed for and rescinded the sale. Plaintiff has perfected an appeal to this court.

The warranties made by plaintiff, as alleged in defendant's answer, are proven and not denied by plaintiff. It therefore follows that the only question for determination is, Did the cooling system installed by plaintiff for defendant fulfill its guarantee? The testimony is overwhelmingly in favor of defendant's contention that it did not. The cooling system or unit was installed on May 3, 1936, and from that time until the middle of July, defendant attempted to use it. At that time he was convinced it would not perform the services for which it had been guaranteed and that it was unfit for the use for which it was intended. Plaintiff was notified and instructed to take the cooling system back. It is unnecessary to relate the continuous trouble with the engine which operated the system, but it suffices to say that defendant had much difficulty in starting the engine, was forced to call in a mechanic on many occasions to start it; and that after it was started it would run a short time and stop. On the occasions the engine did function properly, the system would not cool the milk below a temperature of 56 degrees Fahrenheit, and the requirements of the board of health insist that the milk be cooled to at least 46 degrees Fahrenheit.

Before defendant purchased this system, he was successfully using ice to cool his milk. After acquiring it, he was forced to continue using ice a great part of the time. His purpose in buying the cooling system was to eliminate the cost of ice and also to do away with much labor which was necessary when ice was used. The system failed to eliminate either.

Plaintiff contends there were no defects in the cooling system itself, and the reason it failed to render the services required was due to a lack of knowledge displayed in operating it. The testimony is clear that the directions given by plaintiff's agents at the time of installation were followed minutely. On many occasions defendant complained to plaintiff about the failure of the system to come up to its guaranty and plaintiff had every opportunity to correct any defects in the system. Defendant's trouble calls were often unanswered, and when they were, usually several days would pass before they were attended to. Although defendant was almost constantly calling on plaintiff to put the system in shape to do what it was guaranteed to do, there was never one time that plaintiff operated and tested the system in order to see if it would properly cool the milk. After defendant had notified plaintiff that he considered the sale rescinded, it sent its original salesman to defendant's dairy and he claims to have set the engine up from first speed to fifth, and that he then reduced the temperature to 33 degrees Fahrenheit. However, it is shown that on this occasion the cooling box contained some ice and it was already cool before he made his test. It was at this time that plaintiff suggested the necessity of putting in an aerator in addition to the cooling system it had sold. The offer to add an aerator, upon defendant's complying with certain conditions (which were refused by him), impresses us as an admission on the part of plaintiff that the system sold by it to defendant was unfit for the purpose it was intended. If there were no defects in the system to correct, then it is evident it was not fit for the use intended. If there

were defects which should have been corrected, plaintiff failed in its guaranty in not correcting them for it is an evident fact the cooling system, as it was, was not fit for the purpose it was sold by plaintiff and bought by defendant, and defendant is entitled to have the sale rescinded and that part of the purchase price paid by him returned. A. Baldwin Sales Company, Inc., v. Peterson (La.App.) 143 So. 527; Stewart v. Clay, 10 La.App. 727, 123 So. 158; Brown-Roberts Hardware & Supply Co. v. Evans (La.App.) 153 So. 562; A. Baldwin Sales Company, Inc., v. Mitchell, 174 La. 1098, 142 So. 700, 702.

The last-cited case is on all fours with the one at bar. Practically every issue raised in the instant case was raised in that one and decided adversely to plaintiff. In that opinion the court said:

"It is a familiar principle of our jurisprudence that, unless warranty is waived, the vendor warrants the thing sold as fit for the purpose intended.

"Hawley Down-Draft Furnace Co. v. Southern Chemical & Fertilizing Company, 51 La.Ann. [914] 915, 25 So. 470; Fee v. Sentell, 52 La.Ann. 1957, 28 So. 279; Jackson v. Breard Motor Company, 167 La. 857, 120 So. 478.

"Here, the warranty is not only not waived, but it is expressly stipulated.

"A sufficient defense to plaintiff's demand for the purchase price was that the equipment sold defendant and installed in his plant did not fulfill plaintiff's guaranty. Hence, the burden of showing that it did so comply was clearly upon plaintiff.

"Plaintiff contends that the sole purpose of supplementing the existing equipment in defendant's plant by the equipment which plaintiff furnished and installed was to step up the unit in the brine tank and to enlarge the cooler. And plaintiff earnestly argues that its warranty is no broader than the terms in which it is expressed, and that its guaranty under the contract extended no further than to maintain a low temperature in the brine used in the refrigeration plant.

"But defendant is operating a creamery and milk cooling plant, in order to increase the capacity of which he consulted plaintiff's representatives. He relied upon their superior skill and knowledge to accomplish the desired result. The known purpose for which the new machinery was purchased and installed was to properly cool and preserve milk, and plaintiff's express guaranty was to produce a temperature in the coolers that would do the work. The reference in the guaranty to the temperature at which the brine was to be maintained was merely incidental to the main purpose that the contracting parties had in mind.

"The record satisfies us that the machinery sold and installed by plaintiff failed at all times to do the work it was intended to do. From the beginning, defendant constantly complained to plaintiff about this, and plaintiff's representatives on numerous occasions during a period extending over a number of months worked on the plant in an effort to make it function properly. During this period, defendant incurred an expense of $165.82 for ice which it was necessary to use in order to reduce the temperature of the brine to the required figure.

"Plaintiff makes much of certain charts that were placed in the refrigeration plant by its representatives in order to check its temperature. This appears to have been done on September 19, 1930, and September 20, 1930, approximately a year and four months after the equipment was installed. It is not clear from the testimony whether these charts were placed in the brine tank and in the cooler at the same time, or in the brine tank on one day and in the cooler the next day. In any event, it appears that the test was not made during the regular operation of the plant, but was really a special operation undertaken for the purpose after certain preliminary work had been done on the plant by plaintiff's representatives. We are unable to attach any probative value to the charts in question.

"Plaintiff contends that the reason the plant did not function properly was because the brine pump was too small, and that, through its representative, it offered to remedy the defect by supplying a larger brine pump, which it could do at cost of only $75.00. This offer was not made until sometime in November, 1930, when the engineer employed by defendant to examine the plant had made his report, and after defendant had for approximately a year and a half suffered inconvenience, expense, and loss of milk by the failure of the plant to properly function, notwithstanding plaintiff's efforts to make it do so. The offer was also conditioned upon the payment by defendant to plaintiff of

the past-due installments on the note amounting to $1,209.08. The offer was refused by defendant on the ground that the installation of a new brine pump would be merely another experiment, and that he had enough trouble with the plant for the past two years. We do not think defendant was concluded by plaintiff's offer. He was not obliged to permit plaintiff to indefinitely tinker with his plant in the hope that it might ultimately produce the desired result."

Plaintiff relies upon the case of Bewley Furniture Company v. McDaniel et al., 14 La.App. 243, 129 So. 418, 419, decided by us on July 5, 1930. This was a case in which plaintiff sought to recover the price of a radio and was met with the defense of redhibition. The facts in that case, as shown in the opinion, are so different from those in the one at bar that it would be unnecessary to discuss it, were it not for the excerpt taken from the opinion and relied upon by plaintiff, which, if taken alone, might be held to be in conflict with the settled jurisprudence on that subject. The clause relied on is as follows:

"It was incumbent on defendants to show by proper testimony that the machine itself was defective and they cannot resist payment of the price of the machine until they have done that. It is not shown that any of defendants' witnesses were experts on radio or that any of them knew anything about a radio."

It was not the intention of this court in making the above statement to in any way change the result as to burden of proof, as set out in A. Baldwin Sales Company, Inc., v. Mitchell, quoted from above, in cases where the defense is failure of fulfillment of warranty. A careful reading of the Bewley Furniture Company Case will disclose that the statement of the court relied upon by plaintiff here was made in connection with the finding of fact that plaintiff had met the burden of establishing the fact that the radio was fit for the purpose intended and did fulfill all warranties made by plaintiff when same was sold. When taken with the entire case, the statement does not conflict with the rule laid down in the Baldwin Sales Company, Inc., Case.

We find no error in the judgment of the lower court and it is affirmed, with costs.